UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MICHAEL A. COLLINS,<br><br>                    Plaintiff,<br><br>v.<br><br>CLINICIAN LOPEZ, SERGEANT WILSON, DEPUTY WARDEN MCKAY, WARDEN ROSS,<br><br>                    Defendants. | Case No. 1:24-cv-00454-DCN<br><br>**SUCCESSIVE SCREENING ORDER AFTER MARTINEZ REPORT** |

Plaintiff Michael A. Collins filed a civil rights Complaint subject to court screening. After review, the Court ordered the Idaho Department of Correction (IDOC) Defendants to provide a Martinez Report to address applicable IDOC mental health policies and procedures and explain the treatment Plaintiff is receiving. *See Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978). Defendants have filed their report, with 800 pages of records, and Plaintiff has filed his response. Dkts. 10, 12. Plaintiff has also filed a Motion to Amend Complaint and a Motion for Discovery. Dkts. 8, 14.

Having reviewed the record, the Court enters the following Order dismissing the Complaint for failure to state a federal claim upon which relief can be granted.

## REVIEW OF MARTINEZ REPORT

### 1. Plaintiff's Allegations

Plaintiff, who is about 59 years old, is an inmate at the Idaho State Correctional

Center (ISCC). As of March 2025, Plaintiff was diagnosed with Schizoaffective disorder and was prescribed Cymbalta, Latuda, and Cogentin. He appeared to be mostly compliant with his medications at that time. Dkt. 10-4 at 40.

Plaintiff asks the Court to order prison officials to transfer him to the Acute Mental Health Services Unit (AMHU), also known as C-Block of the Idaho Maximum Security Institution (IMSI). He alleges that Defendants' failure to move him to the AMHU is a violation of his rights under the Eighth Amendment's prohibition of cruel and unusual punishment.

He alleges that Defendants Clinician Lopez, Sergeant Wilson, Deputy Warden McKay, and Warden Ross are inhibiting him from transferring to the AMHU to receive proper care. He claims that his rights as a mental health patient are not being adequately met. He currently is receiving only mental health medication and desires to have other types of mental health treatment in addition to medication. Plaintiff has tried multiple times to be transferred to the AMHU, stating, "I have been given many conditions, which I have met and been sent everywhere, but the place, that would serve me best." Dkt. 3 at 4.

### 2. Standard of Law

The Eighth Amendment to the United States Constitution protects prisoners against cruel and unusual punishment. To state a claim under the Eighth Amendment, Plaintiff must state facts showing that he is "incarcerated under conditions posing a substantial risk of serious harm," as a result of Defendants' actions—which is analyzed under an objective standard. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). Plaintiff must also allege facts showing that Defendants were deliberately indifferent to his

needs—analyzed under a subjective standard.

As to the objective standard, the medical need must be "serious." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (internal citation and punctuation omitted); *McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997). Prisoners are "entitled to psychological or psychiatric care for serious mental or emotional illness" under the Eighth Amendment. *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir. 1979). There is "no underlying distinction between the right to medical care for physical ills and its psychological or psychiatric counterpart." *Id*. (internal quotation marks omitted).

As to the subjective factor, to violate the Eighth Amendment, a prison official must act in a manner that amounts to deliberate indifference, which is "more than ordinary lack of due care for the prisoner's interests or safety," but "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. Deliberate indifference exists when an "official knows of and [recklessly] disregards an excessive risk to inmate health or safety," which means that an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 838. A constitutional tort requires a showing of subjective deliberate indifference by facts demonstrating that the defendant acted deliberately, intentionally, or so recklessly that the conduct can be equated with a desire to inflict harm. *See id.* at 835-38.

 Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate

indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989), *overruled in part on other grounds, Peralta v. Dillard*, 744 F.3d 1076, 1082-83 (9th Cir. 2014). Nor are differences among medical providers. *Snow v. McDaniel,* 681 F.3d 978 (9th Cir. 2012), 681 F.3d at 987), *overruled in part on other grounds*. "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoners health." *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (citation omitted).

### 3.  Report of Plaintiff's Mental Health Care

Housing for inmates with mental health needs is governed by IDOC Standard Operating Procedure (SOP) 327, which governs which level of treatment inmates receive. Dkt. 10-2. This is the policy followed at IMSI, where the AMHU is located, and at the Idaho State Correctional Center (ISCC), where Plaintiff resides.

The AMHU is designated "for incarcerated individuals with the most profound and debilitating impairments in functioning. These incarcerated individuals may present a serious risk to the safety of self and others." Dkt. 10-2 at 5 (SOP 327). The AMHU is a very restrictive housing assignment with specially trained correctional officers and a dedicated mental health staff providing intensive mental health oversight. Dkt. 10-1 at 3.

IDOC clinical staff regularly evaluate each resident with mental health issues to determine which level of care (LOC) is appropriate. Dkt. 10-2 at 4 (SOP 327). AMHU residents are those who have demonstrated an inability to live in the general population. Dr. Walter Campbell, IDOC chief psychologist, explains: "The AMHU offers stabilization

and programming for residents who are psychotic or clinically unstable (including those who are actively suicidal). Goals include controlling psychotic symptoms, stabilizing patients and keeping them safe, and improving activities of daily living." Dkt. 10-1 at 3.

Plaintiff is currently assessed to receive a "Psychiatric Services" level of care (LOC). This LOC indicates that his mental health needs are currently stable and clinical psychotherapeutic interventions (such as individual sessions) are not clinically indicated. In his current housing, Plaintiff has access to both individual and group mental health services, including psychiatric medication management. Dkt. 10-1 at 5.

Plaintiff initially requested a transfer to the AMHU on May 27, 2023. Dkt. 10 at 5 (citing Med. Records II, Ex. E, p. 7). He has asked to be moved to C-Block or the AMHU at least sixteen (16) times since then. He was evaluated by supervisory clinical staff on Aug. 20, 2024, as well as on January 27, 2025. *Id*. (citing Med. Records, pp. 311; 81). Supervisory clinical staff determined that Plaintiff does not require the LOC provided in the AMHU. Dkts. 10 at 5; 10-1.

Plaintiff may be confused by his lack of transfer to the AMHU, because, at one point, a correctional staff member told him that his transfer to that unit had been started. Plaintiff had grieved not being placed in the AMHU on May 18, 2024. Dkt. 10 at 7. He said, "Can you tell me if any progress has been made on getting me to the C-Tier mental health program in max please." *Id*. at 7 (citing Grievance, at 2). He received a response from Deputy Warden Carver, stating, "The necessary steps have been reportedly taken for you to relocate to IMSI. Your transport will be scheduled in the future." *Id*. at 4.

Carver's communication does not refer to the necessary process for placement in

the AMHU. Dkt. 10 at 7. Carver, the deputy warden, had no authority to determine whether a resident should be moved to the AMHU. *Id*. It is a clinical decision whether to move a resident to the AMHU. "A referral to or discharge from an IDOC mental health unit requires that the sending clinical supervisor reviews and approves the referral and ensures the LOC, treatment plan, and mental health assessments are up to date." Dkt., SOP 327. If the clinical supervisors at each facility do not agree or approve placement in the AMHU, then the chief psychologist becomes involved in the referral and placement. *Id*.

In Plaintiff's case, at no point did any clinical staff member or team determine that he should be moved to the AMHU based on the parameters set forth in SOP 327. Dkt. 10 at 7. He has not been found to be a danger to himself or others. *See id.* (citing Med. Records, pp. 74-77 (January 30, 2025); 173-76 (November 20, 2024); and 228-31 (October 17, 2024) (all finding minimal risk of self-harm/harm to others).

Because all clinical staff have continually agreed that Plaintiff's LOC was appropriate, Dr. Campbell did not become involved in the decisionmaking about whether Plaintiff should be moved to the AMHU. Dkt. 10-1 at 4. Upon a review of Plaintiff's extensive mental health treatment records, Dr. Campbell agrees that Plaintiff's needs are being adequately met at his current mental health level of care and housing. *Id*. at 4-5.

On January 7, 2025, Plaintiff (referred to as "Rst" for "resident") met with a mental health clinician, who noted:

> Rst reported he wants to go to C block to do their MH program. He showed clinician a paper that indicates he can go there. He stated he was just supposed to waiting for transport. Clinician advised Rst she needs to consult with her Clinical Supervisor as she has no knowledge of this. Rst expressed understanding.

> Rst reported he is doing ok in current housing unit. Rst and clinician discussed available groups he may participate in while here. He was provided an anxiety workbook, anxiety journal and journaling paper.

Dkt. 10-4 at 107. This clinical notation references Carver's mistaken communication to Plaintiff about being moved to the AMHU. Carver's mistake does not entitle Plaintiff to be moved to the AMHU. Rather, he must fit the criterial for placement there.

IDOC Defendants assert, and the Court agrees, that Plaintiff has been afforded adequate mental health care in the housing unit he is assigned to. The mental health records reflect that clinical staff have not observed any severe mental health symptoms that would merit a drastically increased level of care, such as placement in the AMHU. The records show that, during the past year, Plaintiff has been seen by mental health clinicians on a regular basis when he has requested an appointment via an HSR, approximately every week or two. Mental health staff (both clinicians and the psychiatrist) have consistently found that he is stable with no evident psychosis. *See, e.g.,* Dkt. 10 (citing Med. Records, pp. 429-30 (April 29, 2024); 323-24 (July 31, 2024); 305-06 (August 23, 2024); 216-17 (October 31, 2024); 180-81 (November 18, 2024); 131-32 (December 20, 2024); and 107-08 (January 14, 2025)).

A sampling of Plaintiff's recent requests for medical care and staff responses (with Plaintiff referred to as "Pt", "Rst",  or "Resident") do not show that Plaintiff meets the criteria for placement in the AMHU:

| | |
|---|---|
| Dec. 5, 2024 | Clinician Redmond met with Pt in A block for clinical contact per HSR requests. Pt was moved from his cell into the A block holding cell for the encounter. Pt reported that he felt "confused" about his feelings for a staff member. Pt stated that he had reported this to security and that |

was the reason he is in A block. Dkt. 10-4 at 148.

Pt stated that he doesn't know what to think about his emotions and that he hasn't had these type of feelings before. Pt reported that he would be staying in A block until the staff member is transferred in January to her new post. In the meantime, the Pt has requested lined paper and word searches. Pt also stated that he has signed up for some classes from the chapel. He stated that currently for his self-care he is meditating and practicing yoga. Pt denied SI/HI/SIB. Pt reports that he has supports on B6. Dkt. 10-4 at 148.

Dec. 18, 2024     Plaintiff wrote: "Need the clinicians if they can to get me Information on relationships and (boundries [sic] how to recognize them). thanks" Clinician Farina met with Pt cell side in A-blk, no privacy concerns were noted, in regard to a weekly seg check and to follow-up with his HSR submitted on 12.18.24. Pt reported he was no longer needing mental health support. He stated that he was doing okay and that medical was assisting him with his medical needs. Pt denied SI/HI/SIB AVH at the time of contact. Dkt. 10-4 at 125.

Dec. 19, 2025     Clinician Richards met with pt cell-side in A block holding cell at the request of security staff. Pt stated that he wanted to be "placed in a suicide cell" but was not suicidal. He denied SI/SIB/HI. He reported he wanted to speak with clinical staff about relationship and boundaries. Clinician informed pt that his HSRs had been received and he was scheduled to meet with clinician. Clinician educated pt on making statements or insinuating that he endorsed SI. Pt expressed understanding and stated that he was concerned that he did not have any of his coping skills due to not having his property which made pt angry. Clinician informed pt options for coping while in A block and pt was agreeable to such a plan. Pt apologized to this clinician for saying something he "didn't mean". No additional follow up at this time. Dkt. 10-4 at 142.

Jan. 19, 2025     Psych Tech "met with resident in Unit 8 to discuss two HSRs they had submitted. Resident stated they are fine, they are not experiencing any anxiety or depression at this time and just wanted journal paper and coping skill packets. Resident was given some of these. When I asked resident why they submitted two HSRs to mental health, they stated they didn't need anything else, and no appointments were necessary. Denied SI, HI, and SIB." Dkt. 10-4 at 97.

Jan. 30, 2025          Plaintiff met with a psychiatric nurse, who noted: "Patient with a history of schizoaffective disorder currently taking Lurasidone, benztropine, and duloxetine for symptom control. He takes the medications daily and denies side effects. He recently placed an HSR to speak with MH care about increasing the dose of medication. Today he states, "I want the bigger dose of mood stabilizer." He endorses mood swings, paranoia, and hypervigilance. He currently denies mania, psychotic symptoms, SI, HI, or other safety concerns. His appetite is good. No other concerns at this time." Dkt. 10-4 at 74. Plaintiff's Lurasidone  dosage was increased. Id. at 77.

Feb. 12, 2025          Clinician Menlove met with Rst for 3/3 follow up cell side in RHU with Rst consent. Rst reported he is doing well today. Rst and Clinician discussed him missing his appointments with this clinician. He reported he fell asleep each time. Rst was advised to submit another HSR when he gets released from RHU and to watch the call out for his appointment. Rst agreed. Rst denied any current symptoms and further denied thoughts of harm to self or others. Dkt. 10-4 at 15.

March 2, 2025          Mental Health Aide Millerstrom met with Resident cell side in Unit 16 for daily clinical contact after he was placed on suicide watch for stated SI. Resident was educated on the limitations of privacy and confidentiality. He was asked what led to his placement on watch to which he stated he was experiencing an increase in AH telling him to kill himself and stating he "isn't worth it". He stated he thinks his AH increased due to a book he was reading by David Patterson. He denied any plan or intent yesterday and today. When asked how he was feeling today he stated "good". He denied any AH since his placement on watch. He was pressed further regarding his AH which he stated he had not experienced when not reading the book. He was asked how he feels about returning to Unit 8 which he stated "fine, I was there for a few days before the AH started and I'm fine going back". He reported planning to utilize writing and reading a different book to cope. He was informed he would be released from watch at this time due to denying SI/SIB and AH. While informing him he would be released he appeared to be talking with no audible sound. He was asked who he was speaking to and he stated "no one, I'm just cold". He was informed he would have 3 days of clinical follow up however he could reach out for help at any time. Dkt. 10-4 at 38.

March 3, 2025          Clinician Wilkins met with resident cell side in unit 8 for post watch follow up. Resident agreed to speak to clinician knowing limitations to privacy. Resident stated he was "not bad and denied any SI/HI/SIB.

Resident reported he has started reading a fantasy book which has been helpful. Resident denied experiencing any anxiety, depression, or auditory or visual hallucinations at this time. Resident denied any questions or concerns at this time. Dkt. 10-4 at 32.

Assessment Noted: "Resident appeared alert and oriented. Resident did not appear to be in any significant distress at this time. Resident presented as pleasant and cooperative throughout encounter. Resident appeared to understand information given to him by head nods and verbal responses and appeared able to advocate for himself. Resident does not appear to be a danger to himself or others at this time. Resident did not present with any deficits in his ability to manage his activities of daily living independently." Dkt. 10-4 at 34.

March 18, 2025  Mental Health Progress Note showing that Plaintiff met with clinician and reported a personal relationship issue. Rst and discussed what is normal and appropriate in terms of feelings and grieving his inability to be in a relationship at this time. Rst reported he has a mentor now and it being helpful. He reported he did not think he will need to see clinician as now that he has a mentor. He reported he can submit a HSR as needed. He expressed having Clinician advise him on today's topic is what he really needed. Dkt. 10-4 at 9.

In response to the Martinez Report, Plaintiff states that "[t]he paperwork that the state used as Defendant's restriction and to show as exhibits, have no bearing on my request to the courts, the one they showed me from my medical files, had nothing to do with what I asked." Dkt. 12 at 1-2. Plaintiff asks the Court to look at his medical files, asserting that the records will show that he has never been spoken to about this case or the need for him to be in C-block at IMSI. *Id*. at 2.

Plaintiff is mistaken in concluding that the records are incomplete or incorrect because they do not contain more content about his requests to be admitted to the AMHU. It is not necessary that expansive analysis about Plaintiff's lack of symptoms to warrant AMHU placement be documented in the records, because the records show that his actual

LOC has been diagnosed, treated, and reassessed. The records reflect that Plaintiff has been evaluated by mental health professionals regularly and do not suggest in any way that Plaintiff meets the SOP criteria for placement in the AMHU. That is, the records do not show that he is an "incarcerated individual[] with the most profound and debilitating impairments in functioning … [who] may present a serious risk to the safety of self and others." Dkt. 10-2 at 5 (SOP 327).

A review of Plaintiff's medical file shows that he is being provided with sufficient mental health care and that, under the SOP, mental health professionals have not recommended that he be transferred to the AMHU. Nothing shows Plaintiff warrants the intensive type of care in the AMHU. Nothing in the medical records shows that mental health professionals or prison officials, including Defendants and those he intends to sue in his proposed amended complaint, have recognized a serious medical or mental health need of Plaintiff and have disregarded it.

Rather, the 800-page medical/mental health file of Plaintiff shows he receives continuous care in prison that is appropriate to his reported symptoms. There is no constitutional right to be housed in a particular unit in prison or in a facility of one's choice. *See Meachum v. Fano*, 427 U.S. 215, 255 (1976); *McCune v. Lile*, 536 U.S. 24, 38 (2002). Plaintiff's medical records tend to reflect the conclusion of the court in *Handy v. Price*, 996 F.2d 1064 (10th Cir. 1993), where the prisoner complained of a variety of illnesses, including a knee injury and Hepatitis C:

> The record does not even approach establishing a denial of adequate medical care, much less an issue relating to a culpable state of mind, i.e., a deliberate indifference with respect to

> Handy's medical conditions.  It shows precisely the opposite.
> Handy's medical records show that he is a prodigious user of
> the medical facilities and services both at the AVCF and
> otherwise available through the Department of Corrections.
> . . .
> A page by page review of Handy's medical records indicates a
> degree of medical treatment which would be envied by the
> majority of the adult population of this country which is not
> incarcerated.

*Id*. at 1067.

Here, as in *Handy*, this Court recognizes that a "quarrel with the doctor as to treatment" raised no constitutional issue.  *Id.* The entirety of the record shows that Plaintiff has not stated a federal claim because he has no allegations or evidence showing objective constitutionally-deficient treatment or subjective deliberate indifference of Defendants and the proposed new Defendants.

## DEFENDANTS' MOTION TO SEAL MARTINEZ REPORT AND EXHIBITS

Defendants ask the Court to seal the Martinez Report and exhibits to protect Plaintiff's medical conditions from public disclosure. Dkt. 11.

There is a strong presumption of public access to judicial records. *See Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006); *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003). A party seeking to file documents under seal bears the burden of overcoming that presumption. *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010) (quoting *Kamakana*, 447 F.3d at 1178).

Parties "who seek to maintain the secrecy of documents" are not entitled to a protective order unless they "meet the high threshold of showing that 'compelling reasons' support secrecy." *Kamakana*, 447 F.3d at 1180. Those compelling reasons must outweigh

the competing interests of the public in having access to the judicial records and understanding the judicial process. *Id*. at 1178-79; *see also Pintos*, 605 F.3d at 679 & n. 6 (court must weigh "relevant factors," including the public's interest in understanding the judicial process).

In *Bailey v. Wexford Medical Service*, 2014 WL 4541266 (D.Md. Sept. 10, 2014) (unpublished), the United States District Court for the District of Maryland issued a well-reasoned decision in a case much like this one, where the court must evaluate a plaintiff's medical records. That court recognized that, even though a privacy interest in the plaintiff's medical records was at stake, the "public's right of access to dispositive motions and the exhibits filed within is protected to an even higher standard by the First Amendment." *Id*. at *5 (citing *Rushford v. New Yorker Magazine, Inc*., 846 F.2d 249, 253 (4th Cir. 1988)). Similarly, in *Doe v. Public Citizen*, 749 F.3d 246, 265-66 (4th Cir. 2014), the court recognized that the public's right to access "extends to a judicial opinion ruling on a summary judgment motion," and that the First Amendment right of access "may be restricted only if closure is 'necessitated by a compelling government interest' and the denial of access is 'narrowly tailored to serve that interest.'" *Id*. at 267, 266.

In the *Bailey* case, Defendant Wexford argued that, even though Bailey had placed his medical information at issue in the case, Wexford's motion and its attached exhibits, which included a doctor's affidavit and hundreds of pages of Bailey's medical records, should be shielded from public view. Wexford also argued that the motion and its exhibits "could not be redacted without eviscerating the purpose of the [m]otion" and without

harming Wexford's ability to present an adequate defense to Bailey's medical claims. *Id*.
at *6.

The Maryland court reasoned and concluded:

> The court agrees that Bailey has placed his medical
> information at issue by asserting in his complaint that he
> repeatedly cut his own wrist and then fabricated a story of
> sexual assault so that he would be taken to a hospital to receive
> proper medical treatment. The court must therefore look to, and
> rely on, the medical records surrounding his treatment. But
> given the quantity of personal medical information in the
> medical records that is unrelated to the issues in this case, and
> the fact that this information is scattered throughout the
> records, Bailey's interest in sealing the full medical records is
> compelling. In contrast, the factual information referenced in
> Wexford's memorandum in support of its motion to dismiss or,
> in the alternative, motion for summary judgment, is
> inextricably tied to the issues in this case, as is the factual
> information in Dr. Ottey's affidavit. In order to narrowly tailor
> the denial of access to serve Bailey's compelling interest in not
> making public a large amount of medical information unrelated
> to his claims, the court grants Wexford's motion to seal as to
> the medical records, but denies the motion as to both
> Wexford's memorandum in support of its motion to dismiss or,
> in the alternative, motion for summary judgment, and Dr.
> Ottey's affidavit.

*Id*.

In this case, the public has a strong interest in inmate civil rights cases against state

actor custodians because (1) prisons are funded by taxpayer dollars, and (2) inmates'

custody must be within the bounds "of  dignity, civilized standards, humanity, and

decency" important to modern society. *See Estelle v. Gamble*, 429 U.S. 97, 102 (1976).

The Court also recognizes that Plaintiff has an interest in keeping his medical records

private, and that he should not have to sacrifice all of his privacy rights to bring a civil

rights suit alleging unconstitutional government conduct. Therefore, the Court will, in large

part, follow the direction of the Maryland district court, and balance the interests of Plaintiff and the public. The Motion to Seal will be granted in part, and denied in part. The medical records will remain under seal, but the Martinez Report (Dkt. 10), SOP documents (Dkt. 10-2 and 10-3) and supporting Affidavits ( Dkts. 10-1, 10-5, and 10-7 will be unsealed.

## ORDER

**IT IS ORDERED:**

1. Plaintiff's Complaint is DISMISSED for failure to state a federal claim upon which relief can be granted.

2. Plaintiff's Motion to Amend Complaint (Dkt. 8) is DENIED as MOOT, because even if the Court permitted amendment as Plaintiff proposes, he still cannot state a federal claim upon which relief can be granted for the reasons shown in the Martinez Report and exhibits.

3. Plaintiff's Motion for Discovery (Dkt. 14) is DENIED as MOOT.

4. Defendants' Motion to Seal Document (Martinez Report exhibits) (Dkt. 11) is GRANTED in part and DENIED in part as set forth above.

DATED: August 19, 2025

David C. Nye
Chief U.S. District Court Judge